Quintez DELONEY, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 22A01–0906–CR–273.

Court of Appeals of Indiana.

Dec. 17, 2010.

Rehearing Denied Feb. 15, 2011.

Bruce A. Brightwell, New Albany, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Angela N. Sanchez, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MAY, Judge.

Quintez Deloney appeals his convictions of and sentences for Class A felony attempted robbery resulting in serious bodily injury[1] and Class A felony burglary resulting in bodily injury.[2] He presents the following issues:

1. Whether the trial court erred in admitting DNA evidence from a hat found at the crime scene;

2. Whether Deloney's sentence subjected him to double jeopardy; and

3. Whether the aggravating and mitigating circumstances used to determine his sentence were an abuse of discretion.

We find the trial court erred in admitting DNA evidence, but affirm Deloney's conviction of and sentence for Class A felony burglary resulting in bodily injury, and remand to the trial court to reduce his conviction of and sentence for attempted robbery from a Class A felony to a Class C felony.

## FACTS AND PROCEDURAL HISTORY[3]

On January 22, 2007, Lewis James was shot and killed. The evidence at the crime scene included a cell phone and a red hat. Deloney and Lance Douglas were arrested three weeks later after it was discovered the cell phone at the scene belonged to Douglas and Deloney allegedly had bragged about his involvement in the crime. The State charged Deloney with Class A felony attempted robbery resulting in serious bodily injury, Class A felony burglary resulting in bodily injury, and murder.[4]

At trial, the State presented evidence and expert testimony, over Deloney's objection, from DNA technician Amy Winters regarding DNA collected from the red hat found at the scene. She testified the sample contained DNA from two or three people, which made it impossible for her to

1. Ind.Code §§ 35–41–5–1 and 35–42–5–1(1).

2. Ind.Code § 35–43–2–1.

3. We heard oral argument at the University of Evansville on October 4, 2010. We thank the University for its hospitality and commend counsel on the quality of their advocacy.

4. Ind.Code § 35–42–1–1.

calculate the probability that Deloney contributed to the DNA found on the red hat. Winters could not exclude Deloney or Douglas from the DNA profiles, but neither could she include them. The State also presented evidence that Deloney was seen with Douglas on the night of the crime near the crime scene, he ceased calling Douglas's cell phone after the incident,[5] and he told multiple people of his involvement with the crime.

Following a jury trial, Deloney was acquitted of murder, but convicted of Class A felony attempted robbery resulting in serious bodily injury and Class A felony burglary resulting in bodily injury. The court sentenced him to fifty years for Class A felony attempted robbery resulting in bodily injury, and thirty years for Class A felony burglary resulting in bodily injury, with his sentences to be served consecutively for an aggregate sentence of eighty years.

## DISCUSSION AND DECISION

### 1. *Admission of DNA Evidence*

A trial court has broad discretion in ruling on the admissibility of evidence, and on review, we will disturb its ruling only on a showing of abuse of discretion. *Sparkman v. State,* 722 N.E.2d 1259, 1262 (Ind.Ct.App.2000). When reviewing a decision under an abuse of discretion standard, we will affirm if there is any evidence supporting the decision. *Id.* A claim of error in the admission or exclusion of evidence will not prevail on appeal unless a substantial right of the party is affected. Ind. Evidence Rule 103(a). In determining whether error in the introduction of evidence affected a defendant's

substantial rights, we assess the probable impact of the evidence on the jury. *Sparkman,* 722 N.E.2d at 1262.

To be admissible at trial, evidence must be relevant, that is, it must have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 401. Evidence which is not relevant must be excluded. Evid. R. 402. The admission of expert testimony about DNA evidence is governed by Evid. R. 702:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

DNA expert Amy Winters[6] testified at length regarding the process by which DNA is tested. When an analyst receives a sample for testing, any available DNA is extracted and the amount is quantified. Next, the analyst copies the DNA for testing. Winters used the Short Tandem Report (STR) analysis for the DNA found on the red hat. In STR, the analyst examines thirteen different areas, or loci, on a DNA molecule and identifies and records the allele, or genetic designation, at each of those locations. The list of alleles at those locations is called a DNA profile. The

---

5. The State argued the jury could infer Deloney stopped calling Douglas's cell phone because he had been with Douglas at the crime scene and knew Douglas left his cell phone there.

6. Deloney did not challenge Winters' qualifications as an expert or the validity of the scientific method she used.

profile from the crime scene then can be compared to DNA profiles of suspects to determine whether the profiles contain sufficient similarities to be a "match." (Tr. at 615.) Once a "match" is identified, the analyst calculates the probability the two profiles came from the same person.

At trial, Winters testified she could not exclude Deloney or Douglas as one of the people who deposited DNA on the red hat, but neither could she include them: "there just was not enough information for me to say that they [Deloney and Douglas] are contributors." (*Id.* at 650.) She further testified. she could not calculate the statistical significance of any matches between Deloney's profile and the DNA profiles found on the hat because the mixed sample did not allow for statistical analysis; thus, she could not calculate the probability the sample on the hat from the crime scene had or had not come from Deloney.

█ DNA evidence is admissible in Indiana when the DNA analysis indicates a defendant's profile is consistent with DNA found at the crime scene because such evidence has high probative value. *See, e.g., Smith v. State,* 702 N.E.2d 668 (Ind. 1998). However, we have not addressed the admissibility of DNA evidence when— as in this case—a defendant could not be

excluded from a *possibly infinite number* of people matching the crime-scene DNA and·the DNA expert cannot offer a statistical probability whether the crime .scene DNA came from the defendant. We therefore look to decisions from our sister states for guidance regarding the admissibility of DNA evidence in this circumstance.

The reliability of techniques to procure and analyze DNA evidence is evolving, and states have responded differently to the admissibility of less-than-exact results. There seem to be three approaches, which we summarize as: (1) admissibility without statistical data if no match is found,[7] (2) admissibility without statistical data, if the jury is given some guidance regarding the significance of the DNA results,[8] and (3) admissibility only when statistical data is given.

█ The third approach, which requires accompanying statistical data for DNA evidence to be admissible, comports best with our existing law regarding admissibility of evidence. For example, in *Commonwealth v. Mattei,* 455 Mass. 840, 920 N.E.2d 845 (2010), the Massachusetts Supreme Court held it was reversible error to admit expert testimony that the defendant could not be excluded as a potential source of

7. *See, e.g., State v. Bander,* 150 Wash.App. 690, 208 P.3d 1242, 1256 (2009) (determining evidence of inconclusive DNA test results was admissible even if unaccompanied by statistical calculations); . *State v. Edelman,* 593 N.W.2d 419, 424–25 (S.D.1999) (finding DNA evidence admissible absent statistical evidence when defendant could not be "excluded" as a contributor to the DNA evidence found at the crime scene because the evidence assisted the trier of fact); and *Sholler v. Commonwealth,* 969 S.W.2d 706, 710 (Ky.1998) (finding DNA evidence admissible even though expert did not give statistical probabilities based on test results; defendant had burden of producing expert witness to refute State's witness when defendant can only be

"not excluded" as a contributor to a DNA sample found at the crime scene).

8. *See Young v. State,* 388 Md. 99, 879 A.2d 44, 52 (2005) ("scientific advances in DNA analysis have resulted in infinitesimal random match probabilities," which can be used in place of statistical evidence), and *People v. Coy,* 243 Mich.App. 283, 620 N.W.2d 888, 895 (2000) (finding expert testimony regarding DNA evidence is "inadmissible absent some accompanying interpretive evidence regarding the likelihood of the potential match," but statistical evidence is not required; further, DNA evidence without statistical interpretation is inadmissible if it is the only evidence linking the defendant to the crime scene).

DNA found at the crime scene unless there was accompanying testimony explaining the statistical significance of those non-exclusion results. Without statistical data, evidence of a non-match is meaningless, and does not assist the trier of fact in determining the guilt or innocence of the defendant, as required for admissibility of the DNA evidence under Evid. R. 401 and expert testimony thereon under Evid. R. 702. *See State v. Tester*, 185 Vt. 241, 968 A.2d 895, 907 (2009) ("[t]o say that two patterns match, without providing any scientifically valid estimate (or at least, an upper bound) of the frequency with which such matches might occur by chance, is meaningless.") (citation omitted). Therefore DNA evidence that does not constitute a match or is not accompanied by statistical data regarding the probability of a defendant's contribution to a mixed sample is not relevant, Evid. R. 402, and should not be admitted. *See, e.g., Nelson v. State*, 628 A.2d 69, 75 (Del.1993).

In the instant case, Winters was unable to exclude Deloney as a contributor to the DNA profile on the hat, and she was unable to give any statistical analysis of the probability of a match. Therefore, her testimony could not assist the jury in understanding the evidence or make the existence of some fact more probable or less probable. See *Tester*, 968 A.2d at 907. Thus, the DNA evidence and Winters' testimony lacked relevancy and should not have been admitted by the trial court.[9]

Even though the trial court abused its discretion by admitting the DNA evidence and corresponding testimony, we need not reverse Deloney's convic-

tion if the error was harmless. An error in the admission of evidence is harmless if the conviction is supported by such substantial independent evidence of guilt that there is no substantial likelihood that the impermissible evidence contributed to the conviction. *Gonzalez v. State*, 929 N.E.2d 699, 702 (Ind.2010). The State presented evidence Deloney had bragged on multiple occasions about his involvement in the crime, was seen near the scene of the crime on the night of the crime, and had stopped calling the cell phone Douglas dropped at the crime scene. Those pieces of evidence provide substantial independent evidence of guilt that leaves us without doubt that the jury would have convicted Deloney without the impermissible DNA evidence. There existed substantial independent evidence of Deloney's guilt, and thus the trial court's error in admitting the DNA evidence was harmless.

### 2. *Double Jeopardy*

Deloney's convictions of two Class A felonies, when each crime was elevated to a Class A felony based on the same serious bodily injury, *i.e.*, James' death, subjected him to double jeopardy. *See Smith v. State*, 872 N.E.2d 169, 176 (Ind.Ct.App.2007) ("if the same bodily injury was used to enhance Smith's conviction of burglary to a Class A felony as was used to enhance his conviction of robbery to a Class A felony, entering a judgment of conviction for both counts would be improper"), *trans. denied*. Deloney argues his Class A felony attempted robbery conviction should be reduced to a Class C

---

9. We acknowledge a different panel of our court decided the appeal of Deloney's co-defendant, Douglas, and held the trial court did not abuse its discretion in admitting DNA evidence. *See Douglas v. State*, No. 22A01–0907–CR–337, 2010 WL 2284247 (June 8, 2010). However, the thrust of Doug-

las's challenge focused on the prejudicial effect of the DNA evidence and expert testimony under rule 403 rather than its admissibility under Rule 401, arguing that "The evidence's probative value was substantially outweighed by unfair prejudice." (Slip Op. at 5.)

felony, as occurred in *Smith. See id.* (reduction of conviction from Class A to Class B felony would not eliminate double jeopardy violation where enhancement to Class B felony robbery was based on same bodily injury; therefore, conviction was reduced to a Class C felony).

The State concedes Deloney's Class A felony attempted robbery conviction should be reduced, but argues it should be reduced only to a Class B felony. The record presented to us does not permit us to reduce his conviction to a Class B felony. A person may be convicted of Class B felony robbery if the State proves either "bodily injury" to the victim or the defendant was "armed" with a deadly weapon. *See* Ind.Code § 35–42–5–1 ("the offense is a Class B felony if it is committed while armed with a deadly weapon or results in bodily injury to any person other than the defendant"). The record before us does not indicate the jury determined Deloney was armed with a weapon.[10] Without explicit proof of such a finding, our reduction of Deloney's conviction to a Class B felony necessarily would be based on the bodily injury to James and, therefore, would still subject him to double jeopardy[11] *See Smith*, 872 N.E.2d at 176–77 (reducing robbery conviction to a Class C felony to

avoid double jeopardy based on bodily injury). We accordingly remand to the trial court for reduction of Deloney's conviction of attempted robbery from a Class A felony to a Class C felony, and for adjustment of his sentence therefor.

### 3. *Sentencing*

■ Deloney challenges his sentence as both an abuse of discretion and as inappropriate in light of his character and the nature of his offense. Because we reverse and remand for the trial court to modify Deloney's conviction of and sentence for attempted robbery, we need not evaluate the appropriateness of an aggregate sentence that no longer exists. *See Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind.2008) ("appellate review should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of sentence on any individual count").

■ Nevertheless, we can consider whether the trial court abused its discretion when determining the mitigating and aggravating factors relevant to Deloney's sentence. Sentencing decisions are within the trial court's discretion. *Anglemyer v.*

---

10. During final jury instructions, two different instructions were given regarding attempted robbery. In instruction five, the court instructed the jury to find guilt if the State proved, "that on or about January 23, 2007, in Floyd County in the State of Indiana, Quintez Deloney and Lance Douglas did knowingly attempt to take property, to-wit: cash, from Lewis L. James by using force while armed with a weapon, to-wit: a firearm, said act resulting in serious bodily injury, to-wit: Lewis James suffered gunshot wounds." (Tr. at 1976.) But instruction seven, which listed the elements the State needed to prove for the jury to enter a conviction of Class A felony attempted robbery, did not include "using force while armed with a weapon" as a necessary element. (*Id.* at 1979.) The only verdict form for robbery in

the Appendix indicates the jury found Deloney guilty of "Attempted Robbery Resulting in Serious Bodily Injury, a class A Felony." (App. at 372.)

11. Deloney's Appellant's Appendix does not comply with Ind. Appellate Rule 50(C), which requires the table of contents for an Appendix in a Criminal Appeal "specifically identify each item contained in the Appendix, including the item's date." The table of contents in Deloney's appendix listed only "Clerk's Record" for large portions of the record, including an entire 250 page volume. Deloney's failure to specifically identify each item in his appendix has hindered our review, and we admonish counsel to comply with Rule 50 in future appeals.

*State,* 868 N.E.2d 482, 490 (Ind.2007), *reh'g granted on other grounds,* 875 N.E.2d 218 (Ind.2007). While we review the aggravating and mitigating factors considered by the trial court for abuse of discretion, we do not review the relative weight or value assigned to each factor.[12] *Id.* at 491.

The trial court considered the following aggravating factors when sentencing Deloney: "the harm suffered by the victim was significant and greater than the elements necessary to prove the commission of the crime," (Tr. at 2093), Deloney's criminal history, and the victim's mental infirmity at the time of the crime.[13] The trial court considered the following mitigating factors when sentencing Deloney: his age being only fifteen at the time of the crime, and "getting in trouble, and not getting the help you needed from probation, and not having a father figure." (*Id.* at 2100.)

■■ Deloney argues the consideration of the circumstances surrounding James' death was improper, as he was acquitted of James' murder. However, his acquittal does not preclude the trial court from using the circumstances of James' death as an aggravating factor when determining his sentence for the other two crimes. In *Smith,* we held Smith's acquittal of attempted murder, based explicitly on an allegation Smith shot the victim, precluded the State from using the allegation of a shooting to elevate the robbery or burglary charge, when the jury found Smith guilty of those charges based only on an injury inflicted by a blow to the victim's

head. *Smith,* 872 N.E.2d at 177. In the instant case, the jury convicted Deloney of enhanced versions of robbery and burglary based on the serious bodily injury sustained by James. Therefore, this case is distinguishable from *Smith,* and the court did not abuse its discretion by considering the circumstances surrounding James' death as an aggravating factor during sentencing. *See, e.g., Anglemyer,* 868 N.E.2d at 492 (using seriousness of crime as a proper aggravator).

■■ The trial court also considered Deloney's criminal history to be an aggravating factor. The trial court found Deloney's past adjudications of delinquency for acts that would have been resisting law enforcement and theft "obviously had no deterrent effect," (Tr. at 2095), and while his criminal history was somewhat brief, it "has quickly escalated in seriousness and in violence." (*Id.*) A defendant's criminal history is a valid aggravating factor in sentencing. *Rutherford v. State,* 866 N.E.2d 867, 874 (Ind.Ct.App.2007). Thus, we cannot find an abuse of discretion by the trial court in considering Deloney's criminal history as an aggravating factor in determination of his sentence.

■■ Finally, the trial court found the victim's mental infirmity to be an aggravating factor: ". . . the victim was mentally infirm. And the reason I bring this up is that granted, the victim induced his state of intoxication himself, but the fact is you knew it, and your plan was to take advantage of it." (Tr. at 2096.) Deloney

12. Therefore, we cannot review Deloney's allegation the trial court assigned too little weight to the fact that Deloney was only fifteen years old when the underlying crime occurred. *See Anglemyer,* 868 N.E.2d at 491.

13. Deloney claims the trial court considered his lack of remorse as an aggravating factor. In support thereof, Deloney cites a portion of the transcript in which the trial court discussed mitigating factors advanced by Deloney and indicated Deloney "showed absolutely no sympathy or remorse." (Appellant's Br. at 18) (citing Tr. at 2098). Our review of the transcript leaves us without doubt the court was not listing Deloney's lack of remorse as an aggravators, but rather was using that fact to reject one of Deloney's proposed mitigators.

argues "the voluntary ingestion of controlled substances by the victim does not constitute a mental infirmity under the sentencing statute." (Appellant's Br. at 17.) [14] While we agree the use of the victim's mental infirmity as an aggravator was improper, we do not agree with Deloney's reasoning.[15]

In *Scheckel v. State*, 620 N.E.2d 681 (Ind.1993), our Indiana Supreme Court held the trial court erred by finding an aggravating factor in the victim's mental infirmity. That trial court had found, "the victim was in a physically or mentally infirm state in that he was asleep at 3:00 a.m. and had a blood alcohol content of .18 percent." *Id.* at 684. However, while the record did not contain *any* evidence regarding the victim's exact blood alcohol content, it did contain evidence the defendant and victim had scuffled in the moments leading up to the murder, which indicated the victim had not been asleep when the murder occurred. Thus, our Indiana Supreme Court held, "[b]ecause the evidence fails to support the trial court's finding that the victim was in a mentally or physically infirm state due to sleep or blood alcohol content, it was error to find an aggravating circumstance." *Id.* at 684.

In the instant case, there was testimony that James was intoxicated the night of his murder. (*See* Tr. 1163, 1174–75.) However, witness testimony also indicates James ran upstairs to flush drugs upon hearing loud knocks at the door because James believed the police had arrived, when in fact Deloney and Douglas had arrived to rob him. (*Id.* at 1185.) Thus, based on the *Scheckel* reasoning, James was not "mentally infirm" for the purposes of Ind. Code § 35–38–1–7.1(b)(6), and his mental state could not be used as an aggravator in sentencing Deloney.

■■ However, the error was harmless because we believe even without this aggravator the court would have imposed the same or a similar sentence for Class A felony burglary. Deloney was sentenced to thirty years for Class A felony burglary resulting in serious bodily injury, which is the advisory sentence. Ind.Code § 35–50–2–4. The trial court properly found aggravators in the harm suffered by the victim and Deloney's criminal history. The trial court also found Deloney's age, lack of direction, and lack of father figure to be mitigating circumstances. We hold the finding the victim's mental infirmity was an aggravating factor was harmless because the court would have imposed the same sentence. *Roney v. State*, 872 N.E.2d 192 (Ind.Ct.App.2007) (trial court's abuse of discretion in considering Roney's substance abuse as an aggravating circumstance was harmless error because his sentence remained the same based on the weighing of other aggravators and mitigators). Even though we hold the error was harmless, we remand to the trial court should they wish to revise Deloney's sen-

14. Deloney cites *Hancock v. State*, 758 N.E.2d 995 (Ind.Ct.App.2001). However, *Hancock* is distinguishable because there we declined to consider the victim's infirmity due to controlled substances because the involuntary intoxication of the victim was an element of the crime, and thus an improper aggravator. *Id.* at 1007. *Hancock* did not address whether a victim's voluntary ingestion of a controlled substance could leave the victim in a state of infirmity that could be an aggravator for sentencing.

15. In his brief, Deloney specifically alleges the trial court found, "the victim was asleep because he was high on cocaine." (Appellant's Br. at 17) (citing Tr. at 2095). The trial court made no such statement on that page or elsewhere during the sentencing hearing. We remind counsel that we are not obliged to search the record to find support for a party's arguments. *See Vandenburgh v. Vandenburgh*, 916 N.E.2d 723, 726 n. 2 (Ind.Ct.App.2009).

tence for Class A felony burglary without consideration of the victim's mental infirmity as an aggravating factor.

### CONCLUSION

We hold the trial court abused its discretion in its admission of the DNA evidence, but the error was harmless because there was substantial independent evidence supporting Deloney's conviction. Thus, we affirm his conviction of and sentence for Class A felony burglary. To prevent Deloney's exposure to double jeopardy, we vacate his conviction of Class A felony robbery and remand for the court to reduce his conviction of robbery to a Class C felony. On remand, the court should enter a sentence for Class C felony robbery and consider whether it wishes to shorten Deloney's sentence for burglary based on our holding the court erred by finding an aggravator in James' alleged mental infirmity at the time of the crime.

Affirmed in part, reversed in part, and remanded in part.

BAILEY, J., and CRONE, J., concur.